UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | NUMBER |
| **LARRY ANTHONY BEAULIEU** | **01-13250** |
| DEBTOR | CHAPTER 7 |
| | |
| **E. FEDERAL CREDIT UNION** | ADV. NUMBER |
| PLAINTIFF | **02-1031** |
| V. | |
| **LARRY ANTHONY BEAULIEU** | |
| DEFENDANT | |

## MEMORANDUM OPINION

E. Federal Credit Union ("EFCU") has sued for a determination that its claim against debtor, Larry Anthony Beaulieu ("Beaulieu"), is nondischargeable under 11 U.S.C. §523(a)(6). EFCU's complaint incorporates allegations of a pre-bankruptcy state court petition for damages. It contends among other things that Beaulieu removed movables and fixtures from a house that was subject to a mortgage in the credit union's favor, and converted the removed items to his own use. Beaulieu's answer denied that he removed any of the contents or accessories from the house. It recited that the house was in good condition, with nothing missing when he moved out.

Based on the evidence adduced at the trial, the arguments and memoranda, the Court concludes that Beaulieu is liable to EFCU in the amount of $8,961.50, and that the obligation is

nondischargeable under 11 U.S.C. §523(a)(6).

### Facts

Larry and Bridgette Beaulieu were married when they financed a home on Durmast Drive in Greenwell Springs, Louisiana ("Durmast House") through EFCU in May 1998. The loan was secured by the pledge of a collateral mortgage note and properly recorded collateral mortgage.[1] The Beaulieus separated in September 1999 and were divorced in 2000. The parties stipulated that the Beaulieus defaulted on the loan on October 5, 1999. Bridgette Beaulieu filed chapter 7 on July 17, 2000 and Beaulieu filed his own bankruptcy petition on December 20, 2001. Both spouses moved out of the Durmast House and left it vacant at some point in late 1999, although the exact date was not established at trial.

EFCU sued the Beaulieus for executory process on May 3, 2000, and obtained the sheriff's deed to the Durmast House on April 11, 2001. Mark Staid, EFCU's chief financial officer, testified that the credit union typically does not aggressively pursue collection from borrowers at first. He said it usually delays starting foreclosure proceedings while it works with borrowers who want to try to bring their loans current. During that time, the borrowers may be allowed to remain in their homes. In any case, Staid testified that the credit union does not take possession of property on which it forecloses until after the sheriff's sale. This accounts for the fairly long interval between the Beaulieus' departure from the Durmast House, and the credit union's taking possession of the property.

---

[1] At trial, EFCU introduced the collateral mortgage, the collateral mortgage note and the pledge agreement, all dated May 22, 1998, as Exhibits P-3, P-4 and P-5, respectively.

The issue in the case is Larry Beaulieu's liability for damage to and items missing from the Durmast House after he and his former wife vacated the property.

Bridgette Beaulieu testified that on a visit to her former neighborhood in late 2000, she first noticed that items were missing from the Durmast House. The missing items included the front door, exterior lighting kits for the front door, light poles in the front and rear yards, door knobs and ceiling fans. She then drove past Beaulieu's new home on East Black Oak Drive in Baton Rouge, where from the curb she could see ornamental light stanchions and the front door that had once been at her former home.[2] On another drive past the Durmast House, Ms. Beaulieu noticed that three Lennox central air conditioning units were no longer in place.

Some time after her visits to her old neighborhood, Ms. Beaulieu called Vicky Clouatre, an EFCU collection officer at the time, and reported that items were missing from the Durmast House. In April 2001, Clouatre and Donald O'Rourke, a private investigator hired by the credit union, inspected the house and confirmed that many items had been removed from the structure. Ms. Beaulieu, with the assistance of O'Rourke, created a list of the missing fixtures and component parts.

The credit union supported its case with Bridgette Beaulieu's testimony. She testified that the debtor wanted to keep the house even though the couple was splitting up. Mrs. Beaulieu told her husband that she would agree to his retaining the home only if he would pay her for her one half interest in the property. However, Mr. Beaulieu did not earn enough to qualify for a mortgage loan to make this possible. Angered at his inability to keep the home, the debtor threatened in 1999 to burn down

---

[2] Bridgette Beaulieu recognized the items because she herself had purchased them for the old house.

3

the house or "strip it" if he could not keep it, according to Ms. Beaulieu. Bridgette Beaulieu's grandmother lived with the Beaulieus for 16 months before the couple separated. She corroborated Ms. Beaulieu's claim that in late 1999, Beaulieu threatened to burn down or strip the house if he could not keep it. Larry Beaulieu denied ever threatening to gut or burn the house.

The debtor testified that, at some point after he moved out, he became aware of problems at his former home. Beaulieu insisted that he had called someone at EFCU to report that it looked as though someone was planning to remove property from the house. However, he could not remember the name of the credit union representative who took his call, and admitted that he had nothing in writing to corroborate his claim of having called to report the problems.[3] Moreover, both Charles Moore, EFCU's sole collection officer,[4] and Mark Staid, its chief financial officer, testified that they never received any telephone calls from the debtor to report that any items were missing or taken from the house.

## Discussion

EFCU, as the plaintiff, concedes that it must prove by a preponderance of the evidence that Beaulieu incurred an obligation to it as a result of his willful and malicious injury. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991); 11 U.S.C. §523(a)(6).

---

[3] In fact, Beaulieu was impeached with deposition testimony confirming that he had offered no credible evidence confirming that he'd notified any EFCU employee that items had been removed from the house at any time after he left it until August 2002. The transcript of the September 5, 2002 deposition was admitted into evidence by EFCU as Exhibit P-15.

[4] Moore took over responsibility for collection matters after Clouatre retired from the credit union.

### (1) The debtor is liable to EFCU under section 523(a)(6) for converting items formerly located in the Durmast House.

Under Louisiana law, things such as electrical, cooling, plumbing and other installations are component parts, considered permanently attached to a building as a matter of law. La. Civ. Code art. 466; *Miller v. Slam Offshore*, 49 F. Supp. 2d 507 (E.D. La. 1999). Specifically, ceiling fans, air conditioning units and lighting fixtures connected to the building wiring are items that have been considered component parts of a mortgaged building. *See Berot v. Norcondo Partnership*, 544 So.2d 508 (La. App. 5th Cir. 1989) (ceiling fans); *Hyman v. Ross*, 643 So.2d 256 (La. App. 2$^{d}$ Cir. 1994) (air conditioning units); and *American Bank & Trust Co. v. Shel-Boze, Inc.*, 527 So.2d 1052 (La. App. 1st Cir. 1988) (electrical light fixtures that were connected by wiring, as opposed to being movable). Therefore, the items removed from the house were subject to the mortgage in favor of EFCU. La. Civ. Code arts. 469 and 3286(1).[5]

The next question is whether Larry Beaulieu removed items from his former home. The evidence supports a finding that he did.

First, Bridgette Beaulieu actually saw at Larry Beaulieu's new house the front door, front porch light fixture and outdoor light poles and fixtures removed from the Durmast House. The debtor admitted taking the front door, exterior light poles, three ceiling fans and the central air conditioning units.[6] Beaulieu's admission confirms that he damaged EFCU's collateral, and the Court does not

---

[5] Article 469 states that the encumbrance of an immovable, such as a building, includes its component parts. Pursuant to article 3286(1), a corporeal immovable with its component parts is susceptible of mortgage.

[6] The air conditioning units, light poles and ceiling fans Beaulieu has admitted removing from the Durmast House are not listed on the schedules of assets filed in his bankruptcy case. His omission of

5

believe his testimony regarding the reasons he removed items from the home, and disposition of those items.

Second, although Beaulieu claimed to have removed the front door when he found it open and upon learning from a man cutting grass nearby[7] that unidentified persons were taking things from the house, he admitted that he never called law enforcement authorities to report the open door or thefts.

Third, Beaulieu claimed to have replaced the ceiling fans with others of equal value, and to have replaced the front door, though he offered no documents or other evidence to corroborate his claim that he had bought the replacement items. The Court also finds his testimony on this point not credible.

Finally, the debtor's claims regarding the air conditioners merits separate attention. Mr. Beaulieu claims he removed the air conditioning units for safekeeping, and stored them with an unnamed friend who did not charge him for storage. However, he did not tell the credit union about the stored units until August 2002 at the earliest -- months after EFCU filed its dischargeability complaint.[8] The Court finds incredible the debtor's testimony that he removed the units to protect them from theft or vandalism. His delay in making their whereabouts known to the credit union belies his claim to have held the property for safekeeping.

---

those items from his schedules may constitute grounds for revocation of his discharge under 11 U.S.C. §727(d).

[7] At trial, Beaulieu did not subpoena or even provide the name of the man who allegedly told him of the intruders at the Durmast House.

[8] In fact, the first written evidence that Beaulieu had the units was his lawyer's September 20, 2002, letter to EFCU's counsel, which contained an offer to return the units. See Exhibit D-1.

6

Conversion consists of "any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently or for an indefinite time . . . ." *Quealy v. Paine, Webber, Jackson and Curtis, Inc.*, 475 So.2d 756, 760 (1985). It includes removing property from one place to another intending to exercise control over it, transfer of possession of property without authority, altering or destroying property and asserting ownership over property. *See Dual Drilling Company v. Mills Equipment Investments, Inc.*, 721 So.2d 853, 857 (La. 1998).[9] EFCU, as the holder of the mortgage on the Durmast House, has the same rights as the mortgagor/landowner to recover against any person who converts any buildings or other immovables subject to the mortgage. La. R.S. 9:5382.

The evidence shows that Beaulieu removed, transferred, altered and then asserted ownership over the enumerated items with the intent to exercise control over them in a manner inconsistent with EFCU's rights under the mortgage. These acts constitute conversion of EFCU's collateral under Louisiana law.

Although not every conversion gives rise to a liability within the scope of 11 U.S.C. §523(a)(6), an act of conversion, done willfully and maliciously, undoubtedly falls within the statute. *Kawaahau v. Geiger*, 523 U.S. 57, 119 S. Ct. 974, 978, 140 L. Ed. 2d 90 (1998); *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S. Ct. 151, 79 L. Ed. 393 (1934). The evidence supports the conclusion that Beaulieu intended to permanently deprive EFCU of the components he removed from the home, and

---

[9] Conversion requires a finding of intent to exercise dominion or control over property inconsistent with another's rights. *Flexi-Van Leasing, Inc. v. Avondale Container Yard, et al.*, 2000 WL 1285345, 3 (E.D. La. 2000), citing *Louisiana State Bar Ass'n v. Pitre*, 751 So.2d 116, 121 (La. 1986).

that he intended to harm EFCU by damaging its collateral. *In re Miller*, 156 F.2d 598, 606 (5th Cir. 1998) (injury was "willful and malicious" within meaning of 11 U.S.C. §523(a)(6) where there was objective substantial certainty of harm or a subjective motive to cause harm). Accordingly, his liability to EFCU is not dischargeable under 11 U.S.C. §523(a)(6).

Traditionally, if property converted cannot be returned, damages consist of the value of the property at the time of conversion. *Hagberg v. Manuel*, 525 So.2d 19, 22 (La. App. 3d Cir. 1988) (citations omitted). Also, successful plaintiffs are entitled to damages for inconvenience arising from loss of use of the property. *Alexander v. Qwik Change Car Center, Inc.*, 352 So.2d 188, 190 (La. 1977). Based on the evidence, the Court finds that the value of the front door, front porch light, outdoor light poles and fixtures, ceiling fans and air conditioning units Beaulieu removed from the Durmast House, or which he had at his East Black Oak Drive home, was $7,819.[10] Further, the Court will award EFCU $1,142.50 for the inconvenience of having to repair the damage to the Durmast House and for replacing those items they chose to replace.[11]

### (2) The debtor is not liable to EFCU for other items listed as missing from the Durmast House.

There is no evidence that Beaulieu removed or retained any of the other items listed on Exhibit P-10. Those items could have been removed by unknown persons between the time the Beaulieus

---

[10] EFCU's Exhibit P-10, prepared by O'Rourke using figures provided by Ms. Beaulieu, lists the cost of the missing items.

[11] EFCU introduced as Exhibit P-14 the paid invoice for replacement of the missing air conditioning units. The repair and replacement estimate of Asset Management and Recovery Service offered at trial by EFCU, Exhibit P-13, includes extensive roofing, plumbing and interior wall repairs and replacements. The majority of this cost does not relate to injury for which the Court finds Beaulieu liable. Consequently, the Court can only award minimal damages for this work.

vacated the house in late 1999 and late 2000, when Ms. Beaulieu first noticed that items were missing.[12]  Had EFCU believed that the debtor took the items to his new home, it could have sought access to the debtor's new home for inspection under Fed. R. Civ. P. 34, made applicable in this adversary proceeding by Fed. R. Bankr. P.7034, to try to determine whether any other items from the Durmast House were there.  The Court will not conclude on this record that the debtor is liable to EFCU for their loss of these items in the many months between vacancy of the home and the issuance of the writ of seizure or the judicial sale.

## Conclusion

The Court finds that debtor Larry Beaulieu is liable to EFCU in the amount of $8,961.50 for conversion of items removed from the Durmast House, and further finds that this debt is non-dischargeable under 11 U.S.C. §523(a)(6).

Baton Rouge, Louisiana, June 5, 2003.

**s/ Douglas D. Dodd**
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE

---

[12]  EFCU's mortgage authorized it to seek appointment of a keeper for the property, but the credit union offered no evidence that the state court appointed a custodian for the house pending its judicial sale, or explanation for its decision not to seek appointment of a keeper to protect the property.